1                 UNITED STATES DISTRICT COURT

2                 MIDDLE DISTRICT OF LOUISIANA

3

4   GOPINATH GOPALAM          ) C.A. NO. 12-542-JJB-SCR

                                  )

5   VERSUS                    ) JUDGE: BRADY

                                  )

6   CITY OF GONZALES, THROUGH   ) MAGISTRATE: RIEDLINGER

    MAJOR BARNET ARCENEAUX,     )

7   ET AL                     )

                                  )

8

9             TRANSCRIPT OF THE DEPOSITION OF:

10                CORPORAL DAVID BREAUX,

11 PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE,

12 TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

13 ENTITLED AND NUMBERED CAUSE BY CASSANDRA CHENEVERT,

14 CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

15

16            REPORTED AT THE LAW OFFICES OF:

17                 KEAN MILLER, LLP

                  II CITY PLAZA

18                 400 CONVENTION STREET, SUITE 700

                  BATON ROUGE, LOUISIANA 70802

19

20        COMMENCING AT 2:35 P.M., ON JUNE 20, 2013.

21

22

23

24

25


EXHIBIT

Baton Rouge Court Reporters, LLC
225-292-8686


COPY

Case 3:12-cv-00542-JJB-SCR   Document 38-3   09/16/13   Page 1 of 63

1     Q.   Were you acting within the scope of your
2 employment with the Gonzales Police Department on that
3 day?
4             MS. BELL:  Same objection.  But to
5            the extent you know, you can answer.
6 BY MR. ALEXANDER:
7     Q.   Were you working for the Gonzales Police
8 Department, as an employee of the Gonzales Police
9 Department, pursuant to that authority on
10 September 1, 2011?
11     A.   Yes.
12     Q.   Who hired you on that day to go to the scene
13 at 3831 South St. Landry Street?  Who hired you?
14     A.   The contact information that I had from my
15 supervisor were the two people, which is Karl Koch and
16 Wendell Smith that I had a contact for.
17     Q.   Did Mr. Koch and Mr. Smith contact you
18 directly, or did they contact your supervisor first?
19     A.   They contacted my supervisor to set up the
20 details for it.
21     Q.   Then your supervisor contacted you?
22     A.   He put up a detail list of who wants to sign
23 up for the detail.
24     Q.   When you say "detail," does that mean you're
25 working in your -- as a private duty detail?

```
 1  could have been the afternoon.  I don't remember the
 2  exact time.
 3      Q.   It was sometime during the day?
 4      A.   Sure, yeah.
 5      Q.   You spoke to Mr. Koch when you got to the
 6  scene?
 7      A.   Yes, sir.
 8      Q.   Did Mr. Koch give you any further direction
 9  when you got to the scene as to what you were supposed
10  to be doing there?
11      A.   Yes, sir.
12      Q.   And what was your understanding of what you
13  were supposed to be doing after you got to the scene?
14      A.   He told me to stay out in the hallway until
15  they -- I guess they had a board meeting of whatever
16  they were going to do -- and then he instructed me
17  that he was going to walk out Mr. Gopalam to his
18  vehicle and he would leave the premises and that I
19  would just walk behind him to make sure everything was
20  okay and make sure he left the premises, and that was
21  it.
22      Q.   And the reason why you were there was that
23  there was some concern that there may be a scene there
24  or some kind of resistance by Mr. Gopalam?
25      A.   He didn't expect anything.  He just said
```

1  that he wanted an officer present there to help them
2  keep the peace.  It was a termination.  He didn't know
3  if he was going to be disgruntled or not.  I don't
4  know.  He didn't give me any rhyme or reason as far as
5  Mr. Gopalam being terminated or what.
6      Q.   Why don't we just go through P1.  You have a
7  copy of it in front of you.  You indicate, "On
8  September 1, 2011, I was working an extra duty detail
9  at St. James Behavioral Clinic on St. Landry Road."
10  Now, specifically, Corporal Breaux, when you say
11  "extra duty detail," based on your experience as a law
12  enforcement officer, what does "extra duty detail"
13  mean?
14      A.   That means above your regular pay.  When
15  you're off, you work a football game, it's always
16  extra.  It's supplemental income.
17      Q.   So are you getting more per hour, or are you
18  getting paid --
19      A.   It's a base -- it's set by our department as
20  to how much we make an hour doing extra duty.
21      Q.   That's governed by your department?
22      A.   Correct.
23      Q.   Were you in uniform?
24      A.   Yes, sir.
25      Q.   Were you in your police-issued vehicle?

Case 3:12-cv-00542-JJB-SCR   Document 86-86   09/16/13   Page 4 of 63

```
 1        A.    Yes, sir.
 2        Q.    A marked unit?
 3        A.    Yes, sir.
 4        Q.    And when you got to the scene, to the extent
 5   that you needed to, obviously you're in uniform, you
 6   identified who you were?
 7        A.    Who did I identify myself to?
 8        Q.    Yes.   When you got to the scene, you spoke
 9   with Mr. Koch.   He knew who you were, obviously?
10        A.    I introduced myself to him, yeah, as a
11   police officer in full uniform.
12                   MS. BELL:   Could we go off the
13              record for a second?
14                   MR. ALEXANDER:   Sure.
15              (Discussion held off the record.)
16                   MR. ALEXANDER:   Back on the record.
17   BY MR. ALEXANDER:
18        Q.    I thought I asked a few minutes ago if you
19   had any conversations with anybody prior to going to
20   the scene.   Had you had a conversation with Mr. Koch
21   prior to going to the scene?
22        A.    Yes.   I misunderstood the question then.
23        Q.    I may have misphrased it.   Tell me about
24   that conversation.   When?   Where?
25        A.    That was at Cabela's parking lot.
```

1          Q.    Was this on September 1st?

2          A.    Yes, sir.  It was probably 15, 20 minutes

3    before we went over to St. James.

4          Q.    And who initiated that meeting at Cabela's?

5          A.    Karl.

6          Q.    Did he -- he called you to set that meeting

7    up?

8          A.    No, no.  I actually met, I think, Mr. Smith

9    at the RaceTrac on LA 30.  And he said that they

10   weren't ready yet at St. James for the meeting to

11   start or something.  He said that board members were

12   waiting at Cabela's parking lot.  So I followed him

13   over there and met Mr. Koch in the parking lot, and he

14   explained to me my procedures at St. James would be

15   keeping the peace, walking out with Mr. Koch and

16   Mr. Gopalam to his car.  He gave me instructions

17   there.

18         Q.    Mr. Koch gave you instructions there at

19   Cabela's?

20         A.    Yes.  That's the first time I met Mr. Koch.

21   I didn't know who he was.

22         Q.    And it was your understanding that while you

23   were meeting with Mr. Koch at Cabela's, there were

24   other board members at the RaceTrac?

25         A.    No.  There were no other board members at

1  the RaceTrac.

2    Q.   What was your understanding of what was

3  going on at the RaceTrac?

4    A.   Nothing was at RaceTrac.  It was at

5  Cabela's.

6    Q.   You just mentioned RaceTrac.

7    A.   I met Mr. Wendell Smith at RaceTrac, and he

8  told me to go to Cabela's because that's where

9  Mr. Koch was who I was going to be in contact with.

10  That's where I met Mr. Koch, at Cabela's, and he gave

11  me instructions of what to do.

12    Q.   And you met Mr. Smith at RaceTrac because

13  he --

14    A.   He was my contact person to meet.  I was

15  reporting over there to him through my lieutenant.  I

16  didn't know who to meet.

17    Q.   Other than Mr. Smith telling you to go to

18  Cabela's, did he give you any further instruction?

19    A.   No.

20    Q.   So after you met with Mr. Koch at Cabela's,

21  you proceeded together to St. James?

22    A.   He drove separately.  I followed him.

23    Q.   Your report indicates, "I was hired by

24  Wendell Smith and Karl Koch to stand by and keep the

25  peace while the board of directors terminated

1   Mr. Gopalam from his position at St. James

2   Behavioral." So obviously, you stand by that position

3   that you were hired by Mr. Koch and Mr. Smith?

4       A.    That's the two persons who my lieutenant

5   gave me the contact names for. So those two people

6   obviously talked to the lieutenant about the detail,

7   having the officer hired.

8       Q.    Did you receive any direction from your

9   lieutenant as to what your responsibilities were at

10  the scene once you got to St. James?

11      A.    Once I got -- before that?

12      Q.    Before that, yes.

13      A.    The lieutenant basically said the same thing

14  that Karl Koch told me. I was going to be keeping the

15  peace and escort Mr. Gopalam off the property. The

16  same thing my lieutenant told me was the same exact

17  thing that Karl Koch told me.

18      Q.    So they both gave you the same instruction,

19  same direction?

20      A.    Yes, sir.

21      Q.    Why don't you describe, if you would,

22  Corporal Breaux, what happened once you got to the

23  scene, to St. James.

24      A.    What I could recall is some board members

25  went into a big meeting room, and Mr. Koch told me to

 1  stay out in the hallway.  He would come out with
 2  Mr. Gopalam and that we would walk him to his vehicle
 3  and he would leave the property.  That's -- so I
 4  stayed outside of the board meeting in the hallway at
 5  St. James.  Mr. Koch came out with Mr. Gopalam.  They
 6  proceeded to the doors, and we walked down the
 7  sidewalk toward the parking lot.
 8       Q.   And what happened after that?
 9       A.   Mr. Gopalam stopped in front of another
10  building and said that he needed to go in his office,
11  and then Mr. Koch and them had a conversation.
12       Q.   Did you overhear any conversation with
13  Mr. Koch and Mr. Gopalam?
14       A.   No.  I was back behind them.  I didn't make
15  any contact with Mr. Gopalam until later.
16       Q.   Did Mr. Gopalam ever ask you if he could go
17  into his office?
18       A.   I think so, yes.
19       Q.   Why did he want to go into his office, if
20  you recall?
21       A.   I don't remember him telling me the reason
22  why.  He kept saying, "I want to go to my office."
23       Q.   Did you do anything -- let me ask you this:
24  Was it your understanding that Mr. Koch and Mr. Smith
25  had a right to go into Mr. Gopalam's office?  Was that

1  your understanding that they had a legal right to go
2  into his office?
3              MS. BELL:  Object to the form to the
4         extent it calls for a legal conclusion.
5  BY MR. ALEXANDER:
6      Q.   What was your understanding of why -- let me
7  ask you this:  What was your understanding of why
8  Mr. Koch and Mr. Smith wanted to go into Mr. Gopalam's
9  office?
10     A.   When I got to St. James, the only person I
11  was making contact with was Mr. Koch.  Mr. Koch
12  informed me that all of the property that we were in
13  front of or around was St. James' property and that
14  Mr. Gopalam wasn't allowed back into his office
15  because that was property of St. James.
16     Q.   And did you do anything at that point to
17  confirm whether or not what Mr. Koch was telling you
18  was accurate?
19     A.   Not at that point, no.
20     Q.   At any point, did you do anything to confirm
21  whether or not what Mr. Koch was telling you was
22  accurate?
23     A.   No.
24     Q.   Do you recall at any point whether
25  Mr. Gopalam asked you if he could go into his office

1  and retrieve either a lease or a sub-lease that he
2  could show you that allowed him to occupy that office?
3       A.   He never asked me that.  I don't recall him
4  asking me about that.  To go into his office with a
5  lease?  No, I don't remember him saying that.  He just
6  kept on saying that he wanted to go into his office.
7       Q.   But you don't remember why he said he wanted
8  to go into his office?
9       A.   No.  I don't recall anything about going
10  into his office for a lease or anything like that.
11       Q.   Now, at some point Mr. Gopalam began to call
12  9-1-1?
13       A.   Uh-huh.
14                 MS. BELL:  Answer "yes" or "no."
15                 THE WITNESS:  Yes.  Sorry.
16  BY MR. ALEXANDER:
17       Q.   And did you -- what was your understanding
18  at that time of why Mr. Gopalam was calling 9-1-1?
19       A.   My understanding was that there was, I
20  guess, termination procedures going on inside
21  St. James' office, and I don't know if he was mad
22  about it or what.  He didn't give me a reason,
23  Mr. Gopalam.  He just said people were burglarizing
24  his office.
25       Q.   Did you ask him to clarify what he meant

1  when he said that these people are --

2      A.   He wouldn't respond to me when I was asking

3  him.

4      Q.   What were you asking him?

5      A.   I was asking him at that point -- I told him

6  that he needed to leave.

7      Q.   But when you say he wouldn't respond to you,

8  what were you saying to him that he wouldn't respond

9  to?

10     A.   When I was asking him -- I said, "You need

11 to leave."  He wasn't responding either way.  At that

12 point Mr. Koch asked me to tell him to leave.  I asked

13 him to leave, and he wouldn't leave.  He just kept

14 standing there talking on the phone.

15     Q.   I guess my question is this:  Did you ever

16 ask Mr. Gopalam any questions about whether or not he

17 had a right to be in his office?

18     A.   No.

19     Q.   So basically, you took Mr. Koch and

20 Mr. Smith's word at face value?

21     A.   From what I was told by my supervisor and

22 what I was told from Mr. Koch himself, that all of the

23 property was St. James' and that Mr. Gopalam didn't

24 have any legal rights to be in the building or on the

25 property once he was terminated.  That was my

```
 1   understanding from him.
 2       Q.   And also your understanding from your
 3   supervisor?
 4       A.   My supervisor told me to make sure that he
 5   was escorted off of the property according to the way
 6   St. James wanted to.
 7       Q.   What would have happened to Mr. Gopalam if
 8   he had not left the property?
 9                MS. BELL:   Objection to the form to
10                the extent it calls for speculation.
11                MR. MARTIN:   Objection.
12   BY MR. ALEXANDER:
13       Q.   Based upon your experience as a law
14   enforcement officer for 11 years, what would you have
15   done if Mr. Gopalam had refused to leave the property?
16       A.   I would have called my supervisor out there
17   first and let him know, explain to him what was going
18   on.   That's what I would have done.
19       Q.   You would have let who explain?
20       A.   Myself and Mr. Gopalam, probably.   I did, in
21   fact, call my supervisor after he left.
22       Q.   Okay.   But prior to the time that he left,
23   when he's standing there and you're telling him that
24   he had to leave the property, based upon your
25   experience as a law enforcement officer, you indicated
```

| | | |
|---|---|---|
| 1 | Q. | Who is your supervisor? |
| 2 | A. | Right now? |
| 3 | Q. | Who was he then? |
| 4 | A. | Captain Brenn. |
| 5 | Q. | Could you spell that? |
| 6 | A. | B-R-E-N-N, Dowell, D-O-W-E-L-L, and |
| 7 | Lieutenant Homer Martin. | |
| 8 | Q. | Your report indicates that you heard and saw |
| 9 | Mr. Koch ask Mr. Gopalam to leave the property. | |
| 10 | A. | Yes. |
| 11 | Q. | Did Mr. Gopalam refuse to leave the first |
| 12 | time he was asked? | |
| 13 | A. | By Mr. Koch? |
| 14 | Q. | Yes. |
| 15 | A. | Yes. |
| 16 | Q. | Did he refuse to leave the first time you |
| 17 | asked him? | |
| 18 | A. | Yes. |
| 19 | Q. | So what happened?  After you asked him and |
| 20 | he refused to leave, what did you do after that? | |
| 21 | A. | I asked him a second time to leave. |
| 22 | Q. | Then what happened? |
| 23 | A. | He refused. |
| 24 | Q. | Then what happened? |
| 25 | A. | I asked him a third time. |

1   Q. And then what happened?

2   A. He left.

3   Q. Okay. We talked a minute ago about

4 Mr. Gopalam calling 9-1-1. How did you learn that

5 Mr. Gopalam either was or had called 9-1-1?

6   A. Through our central dispatch.

7   Q. So you received contact from your central

8 dispatch?

9   A. Well, I overheard the traffic of them being

10 dispatched to St. James in reference to a burglary in

11 progress.

12   Q. Okay. So it was your understanding,

13 Corporal Breaux, at some point in time, the Gonzales

14 Police Department had dispatched officers to the scene

15 in response to Mr. Gopalam's 9-1-1 call?

16   A. Correct.

17   Q. And why is it that those officers did not

18 arrive at the scene, based on your knowledge?

19   A. Because I canceled them.

20   Q. And you canceled them, according to your

21 report, because you indicated to them that nobody was

22 breaking into Mr. Gopalam's office?

23   A. That's correct.

24   Q. Again, the information that you had that

25 allowed you to conclude that nobody was breaking into

```
 1        A.    Right.
 2        Q.    And according to your report, after you did
 3   that, you, once again, asked Mr. Gopalam in a stern
 4   manner to leave the premises?
 5                    MR. MARTIN:  Objection to form.
 6                    MS. BELL:  Join.
 7                    THE WITNESS:  Right, because it was
 8               during -- yeah, exactly, yes.  I'm trying
 9               to remember.  The point where the 9-1-1
10               call came through, I was still in front
11               of Mr. Gopalam, yes.
12   BY MR. ALEXANDER:
13        Q.    And according to your report, Mr. Gopalam,
14   even after he left the premises, continued to call
15   9-1-1?
16        A.    That was my understanding, yes.
17        Q.    Do you have -- how is that your
18   understanding?  Why do you believe that, that he
19   continued --
20        A.    Because dispatch was still informing me that
21   he was dialing 9-1-1, or -- I don't know if it was him
22   calling 9-1-1, but 9-1-1 was calling about a burglary
23   still being in progress.  And I informed him that
24   Mr. Koch told me that these were St. James'
25   representatives, which were the same ones I saw going
```

1  into the board meeting, the same ones that were
2  present around the office.
3      Q.   So all of the knowledge that you had when
4  you were on the scene on September 1, 2011, on South
5  St. Landry at St. James, came to you from Mr. Koch or
6  indirectly through your supervisor?
7      A.   Yes, sir.
8      Q.   Now, the last part of your report, Corporal
9  Breaux, indicates that you stayed at St. James until
10 all work related to this matter was completed?
11     A.   Yes, sir.
12     Q.   Could you clarify what you mean by that
13 statement?
14     A.   Basically, I stood by outside until I was
15 released by St. James and I was done with my detail.
16 My work would be, I guess, making sure Mr. Gopalam did
17 not return because he was terminated from St. James,
18 and that was my work-related part of it.
19     Q.   Did you ever see -- at any time while you
20 were at the scene, did you ever see anybody go into
21 Mr. Gopalam's office?
22     A.   From the outside, no.
23     Q.   Did you ever see anybody removing anything
24 or walking out of the direction of Mr. Gopalam's
25 office with anything in their hands?

1       Q.   Did you happen to notice any signs in front
2  of the front part of the building indicating "Apollo
3  Management, LLC"?
4       A.   Yes, sir.
5       Q.   You did?
6       A.   Yes, sir.
7       Q.   Did you ask any questions about who owned
8  Apollo, LLC, or why that sign was there?
9       A.   Ask who?
10      Q.   Anybody.  Did you investigate further as to
11 why an Apollo Management, LLC, sign would have been
12 there near -- near the office there?
13      A.   After Mr. Gopalam left, Mr. Karl Koch said
14 that the property belongs to St. James, not Apollo.
15 And that was the last -- my understanding from him is
16 that St. James Behavioral Hospital was there and the
17 St. James Administrative Apollo building was here.  I
18 didn't know what "Apollo" meant other than what
19 Mr. Karl told me, that this building we were in front
20 of, where supposedly his office was, was St. James'
21 property.
22      Q.   All right.  You don't know one way or the
23 other whether or not Mr. Koch or Mr. Smith or anybody
24 had sought authority from a judge to go into
25 Mr. Gopalam's office or have him leave the premises?

1     Q.    How much were you paid for this job?
2     A.    Our normal rate back then was $25 an hour.
3  I think I got paid for a four-hour minimum.  They had
4  a minimum, so it was a hundred dollars.
5     Q.    So you received a hundred dollars for this?
6     A.    I believe so.
7     Q.    From St. James?
8     A.    Yes, sir.  A representative from St. James,
9  yes, sir.
10    Q.    I asked you what you would have done if
11 Mr. Gopalam refused to leave the property, and I think
12 you answered that satisfactory.  Based upon your
13 experience as a law enforcement officer, what action
14 do you feel you would have taken if Mr. Gopalam had
15 tried to enter his office?
16               MS. BELL:  Objection.  Speculation.
17 BY MR. ALEXANDER:
18    Q.    Simply just tried to go into his office?
19    A.    Under the circumstances, what I was told and
20 what I was instructed, he probably would have been
21 arrested.
22    Q.    Did you tell Mr. Gopalam that?
23    A.    No, sir.
24    Q.    You never told Mr. Gopalam that -- to get
25 away from going into the office?  Did you ever tell

1  Mr. Gopalam, "Mr. Gopalam, either leave the property,
2  or I'm going to place you under arrest"?
3       A.   No, sir.  I asked Mr. Gopalam to leave
4  several times nicely, and he kept refusing, and then
5  the last time I asked him in more of a command voice,
6  I said, "Sir, you need to leave the property."  I
7  explained to him what the circumstances could be if he
8  didn't leave the property, the options.
9            I didn't want to put the man in jail.
10 He just got terminated, and I'm sure he felt bad.
11 But, unfortunately, being the law enforcement officer,
12 he could have went to jail, but I didn't threaten him.
13 He left on his own.  I didn't put my hands on him or
14 anything.
15      Q.   Did you have any discussions with Mr. Koch
16 about Mr. Gopalam's ownership interest in St. James
17 Behavioral Health Hospital?
18      A.   Mr. Gopalam's ownership?
19      Q.   Yes.
20      A.   No.
21      Q.   So as you sit here today, you don't have any
22 knowledge of what his ownership interest is in
23 St. James Behavioral Health Hospital?
24      A.   I have no idea, you know, anything about his
25 St. James position other than he was employed there.

```
 1        A.    It depends on the situation of the -- the
 2   extent of the complaint.
 3        Q.    Well, you indicated that you were sure he
 4   did.
 5        A.    I was told he did by the Chief.
 6        Q.    Okay.   You were told that the Chief did a
 7   written report?
 8        A.    I don't know if he did a written report or
 9   not, but he told me that there was a complaint, that
10   he had a written report against me.
11        Q.    Do you know whether or not that complaint
12   was investigated?
13        A.    Yes.   The Chief investigated it himself.
14        Q.    Do you know what he did in that
15   investigation?
16        A.    I don't have the particulars of what he did.
17   I never got a copy of his findings.
18        Q.    Based on your experience as a law
19   enforcement officer, when a complaint like that is
20   investigated, what does the investigation entail?
21   What is typically done?
22        A.    It depends on the scope of the complaint.
23        Q.    Well, let's take this one.
24        A.    I have no idea what the Chief does in an
25   investigation.   I don't know.   I don't know what he
```

```
 1               C E R T I F I C A T E
 2               I, Cassandra S. Chenevert, Certified Court
      Reporter in and for the State of Louisiana, as the
 3    officer before whom this testimony was taken, do
      hereby certify that CORPORAL DAVID BREAUX, after
 4    having been duly sworn by me upon authority of R.S.
      37:2554, did testify as hereinbefore set forth in the
 5    foregoing 53 pages.
 6               I further certify that said testimony was
      reported by me in the Stenotype reporting method, was
 7    prepared and transcribed by me or under my personal
      direction and supervision, and is a true and correct
 8    transcript to the best of my ability and
      understanding.
 9
                 I further certify that the transcript has
10    been prepared in compliance with transcript format
      guidelines required by statute or by rules of the
11    board, that I have acted in compliance with the
      prohibition on contractural relationships, as defined
12    by Louisiana Code of Civil Procedure Article 1434 and
      in rules and advisory opinions of the board.
13
                 I further certify that I am not an attorney
14    or counsel for any of the parties, that I am neither
      related to nor employed by any attorney or counsel
15    connected with this action, and that I have no
      financial interest in the outcome of this matter.
16
                 This certificate is valid only for this
17    transcript accompanied by my original signature and
      original required seal on this page.
18
                 Baton Rouge, Louisiana, this 12th day of
19    July, 2013.
20
21
22    CASSANDRA S. CHENEVERT, CCR, RPR
23
24
25
```



OFFICIAL SEAL
CASSANDRA S. CHENEVERT
Certified Court Reporter
In and for the State of Louisiana
Certificate Number 2012005
Certificate expires 12-31-13

1                    UNITED STATES DISTRICT COURT
2                    MIDDLE DISTRICT OF LOUISIANA
3
4   GOPINATH GOPALAM            )   C.A. NO. 12-542-JJB-SCR
                                )
5   VERSUS                      )   JUDGE:  BRADY
                                )
6   CITY OF GONZALES, THROUGH   )   MAGISTRATE:  RIEDLINGER
    MAJOR BARNET ARCENEAUX,     )
7   ET AL                       )
                                )
    _____    )
8
9                 TRANSCRIPT OF THE DEPOSITION OF:
10                    WENDELL BRUCE SMITH,
11  PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE,
12  TAKEN ON BEHALF OF DEFENDANTS, THE CITY OF GONZALES,
13  SHERMAN JACKSON, AND DAVID BREAUX, REPORTED IN THE
14  ABOVE ENTITLED AND NUMBERED CAUSE BY CASSANDRA
15  CHENEVERT, CERTIFIED COURT REPORTER FOR THE STATE OF
16  LOUISIANA.
17
18             REPORTED AT THE LAW OFFICES OF:
19                  PERCY, LANOUX, MUMPHREY & MARTIN
                    712 NORTH BURNSIDE AVENUE
20                  GONZALES, LOUISIANA 70737
21
22         COMMENCING AT 10:35 A.M., ON JUNE 19, 2013.
23
24                                          EXHIBIT
25                                            B

1    A.   Yes.

2    Q.   Are you involved in any other sort of

3 employment?

4    A.   Louisiana Health and Wellness.

5    Q.   Is that in Houma?

6    A.   In Houma.  Both of those businesses have

7 closed, but I'm still technically -- yes.

8    Q.   Who is Karl Koch?

9    A.   He was an attorney that represented the

10 facility.

11    Q.   And when you say "the facility," are you

12 talking about St. James Behavioral Health --

13    A.   Yes.

14    Q.   Let me finish my question, Mr. Smith.

15    A.   I'm sorry.

16    Q.   It's okay.  It's a typical mistake.  Karl

17 Koch is the attorney that represented the St. James

18 Behavioral Health Hospital?

19    A.   Yes.

20    Q.   And was he the attorney for St. James

21 Behavioral Health Hospital on September 1, 2011, which

22 is the date of the incident giving rise to this

23 lawsuit?

24    A.   Yes.

25    Q.   Orient me a little bit about the St. James

1      Q.   Not to allow Mr. Gopalam back into the
2   building.
3      A.   I don't know if anyone told Officer Breaux
4   that, no.
5      Q.   Are you aware that Mr. Gopalam made 9-1-1
6   calls on September 1, 2011?
7      A.   No.
8      Q.   Other than your meeting with -- other than
9   the time that you saw Officer Breaux at the RaceTrac,
10  did you have any subsequent interaction with
11  Officer Breaux?
12     A.   Before he left, I paid him.
13     Q.   What did you pay him?
14     A.   I don't remember.  I think it was -- I can't
15  say exactly.
16     Q.   I believe there's some sort of standard fee.
17  I think it's $25 an hour for detail work.
18     A.   I want to say a hundred or -- I'm not sure.
19  I could get that information for you.
20     Q.   I think that's in line with what my
21  understanding is.  I think there's a four-hour
22  minimum, so a hundred dollars would make sense.
23     A.   Yeah.
24     Q.   And that payment that you made was on behalf
25  of St. James Behavioral Health Hospital?

1    A.    Yes.

2    Q.    Do you know if the Gonzales Police

3 Department was asked to provide further detail work

4 after September 1, 2011?

5    A.    I believe that we asked for them to be there

6 the next day.  I'm not a hundred percent sure on that,

7 but I think we did have him there another day.

8    Q.    Was that another contact that Mr. Koch would

9 have made with the police department?

10    A.    Yes.

11    Q.    Officer Breaux has told me that he did not

12 come to St. James on September 2nd, 2011.  Do you have

13 any reason to dispute that?

14    A.    I'm not sure who came.  I wasn't involved in

15 any of that the following day.

16    Q.    Why was Mr. Gopalam not allowed back in the

17 building on September 2nd, 2011?

18    A.    There was a concern that there would be an

19 altercation, an argument.  We just wanted to get what

20 we needed to get and get out of there.

21    Q.    And was it St. James Behavioral Health

22 Hospital's understanding at that time that y'all were

23 waiting for that issue to be resolved with the judge,

24 and for -- I think by that time Mr. Gopalam had filed

25 something with the court and y'all were waiting for

```
 1        A.    No.
 2        Q.    No?
 3        A.    They didn't touch or -- they weren't
 4   involved in any of that.
 5        Q.    Was there ever an agreement between anybody
 6   at St. James Behavioral Health Hospital and
 7   Officer Breaux or any of the officers that work with
 8   the Gonzales Police Department to commit a crime?
 9        A.    Never.
10                  MR. ALEXANDER:  I want to just
11               object to the phrasing of the question.
12               Mr. Smith is obviously not a lawyer and
13               would not have comprehensive knowledge
14               under the law of whether or not any
15               action he took violated the law or not.
16               So subject to that, obviously I'll accept
17               the answer.
18   BY MS. BELL:
19        Q.    Mr. Smith, do you take issue with anything
20   that Officer Breaux did on September 1, 2011?
21        A.    No.
22        Q.    To the extent you know, does St. James
23   Behavioral Health Hospital take issue with anything
24   that Officer Breaux did on September 1, 2011, as it
25   relates to Mr. Gopalam?
```

```
 1                   C E R T I F I C A T E
 2              I, Cassandra S. Chenevert, Certified Court
        Reporter in and for the State of Louisiana, as the
 3      officer before whom this testimony was taken, do
        hereby certify that WENDELL BRUCE SMITH, after having
 4      been duly sworn by me upon authority of R.S. 37:2554,
        did testify as hereinbefore set forth in the foregoing
 5      60 pages.
 6              I further certify that said testimony was
        reported by me in the Stenotype reporting method, was
 7      prepared and transcribed by me or under my personal
        direction and supervision, and is a true and correct
 8      transcript to the best of my ability and
        understanding.
 9
                I further certify that the transcript has
10      been prepared in compliance with transcript format
        guidelines required by statute or by rules of the
11      board, that I have acted in compliance with the
        prohibition on contractural relationships, as defined
12      by Louisiana Code of Civil Procedure Article 1434 and
        in rules and advisory opinions of the board.
13
                I further certify that I am not an attorney
14      or counsel for any of the parties, that I am neither
        related to nor employed by any attorney or counsel
15      connected with this action, and that I have no
        financial interest in the outcome of this matter.
16
                This certificate is valid only for this
17      transcript accompanied by my original signature and
        original required seal on this page.
18
                Baton Rouge, Louisiana, this 12th day of
19      July, 2013.
20
21                          Cassandra Chenevert
22                 CASSANDRA S. CHENEVERT, CCR, RPR
23                           OFFICIAL SEAL
24                        CASSANDRA S. CHENEVERT
                          Certified Court Reporter
25                    In and for the State of Louisiana
                        Certificate Number 2012005
                        Certificate expires 12-31-13
```

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

GOPINATH GOPALAM

VERSUS

CITY OF GONZALES, THROUGH MAYOR
BARNEY ARCENEAUX, ET AL

C.A. NO. 12-542-JJB-SCR

JUDGE: BRADY

MAGISTRATE: RIEDLINGER

## DECLARATION OF DAVID BREAUX

1.  My name is **DAVID BREAUX**.

3.  On September 1, 2011, I was a patrolman for the City of Gonzales Police Department.

4.  I have worked for the City of Gonzales Police Department since 1999.

5.  On September 1, 2011, I provided security to St. James Behavioral Hospital, Inc. while Gopinath Gopalam was terminated from his job.

6.  I did not have an agreement with Karl Koch, Wendell B. Smith, Dr. Rama Kongara, Dr. Lance E. Bullock, Rick Bennett or any other representative of St. James Behavioral Health Hospital, Inc. to violate Gopinath Gopalam's constitutional rights.

7.  On September 1, 2011 I understood, based on information conveyed to me, that the entire premises located on South St. Landry Street, Gonzales, Louisiana was owned by St. James Behavioral Health Hospital, Inc.

8.  Attached as Exhibit C-1 is the Gonzales Police Department Incident Report, including my narrative report for incident number 2011-00008429.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

Executed on this ___13___ day of September, 2013.

DAVID BREAUX

EXHIBIT

C

## GONZALES POLICE DEPARTMENT - INCIDENT REPORT

### INCIDENT DETAIL

| ORI # | INCIDENT NUMBER | INCIDENT TYPE | PRIORITY | NATURE OF CALL |
|---|---|---|---|---|
| LA0030200 | 2011 - 00008429 | CIV | | STATNED BY WHILE SUBJECT WAS RELEASED |
| | PHONE | RECEIVED USER | RECEIVED ORI# | DISPATCH USER |
| | ( ) - | LA0030200-G070 | | |
| | DISPATCH ORI# | CAD ORI# | DISPATCH SHIFT | CALL FOR SERVICE NUMBER |
| | | | | . |
| | MUTUAL AID | BEAT | FIRE QUADRANT | EMS DISTRICT |
| | STATION | SOURCE | REPORT REQUIRED? | PRIOR HAZARD? |
| | CALL DATE/TIME | DISPATCH DATE/TIME | ENROUTE DATE/TIME | ARRIVE 1 DATE/TIME |
| | 9/2/2011 5:04:00 AM | | | |
| | ARRIVE 2 DATE/TIME | IN STATION DATE/TIME | DEPART 1 DATE/TIME | DEPART 2 DATE/TIME |
| | CLEAR DATE/TIME | | | |

### DISPOSITIONS

### LOCATION

| LOCATION | | | CROSS STREET | VENUE |
|---|---|---|---|---|
| 3138,,SOUTH (S),ST LANDRY,ROAD (RD),, | | | | GONZALES |

### PERSONS

| PERSON TYPE | NAME | NAME | ADDRESS | CITY |
|---|---|---|---|---|
| OTHER | GOPALAM,GOPINATH,, | A | 3138,,SOUTH (S),ST LANDRY,ROAD (RD),, | GONZALES |
| | STATE | ZIP CODE | PHONE | RACE |
| | LA | 70737 | ( ) - | WHITE |
| | SEX | HEIGHT | WEIGHT | SSN |
| | MALE | | | - - |
| | DATE OF BIRTH | AGE | DRIVER LIC. NUMBER | DRIVER LIC. STATE |
| COMP | NAME | NAME | ADDRESS | CITY |
| | SMITH,WENDELL,, | A | 38223,,,DUPLESSIS,,, | PRARIEIVILLE |
| | STATE | ZIP CODE | PHONE | RACE |
| | LA | 70769 | ( ) - | WHITE |
| | SEX | HEIGHT | WEIGHT | SSN |
| | MALE | | | - - |
| | DATE OF BIRTH | AGE | DRIVER LIC. NUMBER | DRIVER LIC. STATE |
| | 1/5/1962 | 49 | 004626607 | LA |
| PERSON TYPE | NAME | NAME | ADDRESS | CITY |

Gonzales_0002

Case 3:12-cv-00542-JJB-SCR   Document 38-3   09/16/13   Page 30 of 63

EXHIBIT
C-1
ALL-STATE LEGAL®

| COMP | KOACH,KARL,, | A | 588,,SOUTH (S),ACADIAN,,, | BATON ROUGE |
|---|---|---|---|---|
| | STATE | ZIP CODE | PHONE | RACE |
| | LA | 70806 | ( ) - | WHITE |
| | SEX | HEIGHT | WEIGHT | SSN |
| | MALE | | | - - |
| | DATE OF BIRTH | AGE | DRIVER LIC. NUMBER | DRIVER LIC. STATE |
| | 3/22/1960 | 51 | 00434637 | LA |
| PERSON TYPE | NAME | NAME | ADDRESS | CITY |
| COMP | RAMAKRISHNARDO,KONGARA,, | A | 17802,,WEST (W),AGUSTA,,, | BATON ROUGE |
| | STATE | ZIP CODE | PHONE | RACE |
| | LA | 70810 | ( ) - | WHITE |
| | SEX | HEIGHT | WEIGHT | SSN |
| | MALE | | | - - |
| | DATE OF BIRTH | AGE | DRIVER LIC. NUMBER | DRIVER LIC. STATE |
| | 5/12/1943 | 68 | 002860460 | LA |
| PERSON TYPE | NAME | NAME | ADDRESS | CITY |
| COMP | BULLOCK,LANCE,, | A | 3138,,SOUTH (S),ST LANDRY,ROAD (RD),, | GONZALES |
| | STATE | ZIP CODE | PHONE | RACE |
| | LA | 70737 | ( ) - | WHITE |
| | SEX | HEIGHT | WEIGHT | SSN |
| | MALE | | | - - |
| | DATE OF BIRTH | AGE | DRIVER LIC. NUMBER | DRIVER LIC. STATE |

**VEHICLES**

---

Document description: NARRATIVE Sep 02 2011 05:09

Incident # 201100008429 created By: BRE110 - on: 9/2/2011 5:09:31 AM


ON 9-1-2011, I OFC D BREAUX WAS WORKING AN EXTRA DUTY DETAIL AT ST
JAMES BEHAVIORAL CLINIC ON ST. LANDRY ROAD. I WAS HIRED BY WENDELL SMITH
AND KARL KOACH TO STAND BY AND KEEP THE PEACE WHILE THE BOARD OF
DIRECTORS TERMINATED MR. GOPINATH GOPALAM FROM HIS POSITION AT ST.
JAMES BEHAVIORAL. WHEN MR. GOPALAM WAS FIRED, MYSELF AND MR. KOACH,
THE LAWYER FOR ST. JAMES, WALKED MR. GOPALAM TO HIS VEHICLE. AS WE WERE
WALKING, MR. GAPALAM STOPPED IN FROM OF HIS OFFICE AT APOLLO
MANAGEMENT. HE WANTED TO RETRIEVE HIS COMPANY COMPUTER AND SOME
FILES OUT OF HIS OFFICE. MR. KOACH ADVISED HE THAT HE WAS NOT ALLOWED TO
GO BACK IN HIS OFFICE. MR. GAPALAM BECAME SOMEWHAT IRATE AND STARTED

Gonzales_0003

Case 3:12-cv-00542-JJB-SCR   Document 38-3   09/16/13   Page 31 of 63

USING HIS PHONE. HE APPEARED TO BE CALLING HIS LAWYER. MR. KOACH ASKED
MR. GAPALAM SEVERAL TIME TO LEAVE THE PROPERTY IN A CALM AND NICE
MANNER. I THEN ASKED MR. GAPALAM TO LEAVE IN A NICE WAY AND HE JUST
LOOKED AT ME AND STARTED USING HIS PHONE AGAIN. MR. GOPALAM WAS
CALLING 911 TO REPORT THAT PEOPLE WERE BREAKING INTO HIS OFFICE AND
STEALING HIS COMPUTER AND FILES. I INFORMED DISPATCH THAT THIS WAS NOT
THE CASE AND CANCELED ANY UNITS IN ROUTE. I THEN ASKED MR. GOPALAM IN A
STERN MANNER TO LEAVE THE PROPERTY AND NOT TO CALL 911 AGAIN. MR.
GOPALAM THEN LEFT ON HIS OWN ACCORD AND PARKED ACROSS THE STREET. HE
CONTINUED TO CALL 911 TO REPORT A BREAK IN AT HIS OFFICE.

I STAYED AT ST. JAMES UNITL ALL WORK RELATED TO THIS MATTER WAS
COMPLEATED. I RETURNED TO THE POLICE STATION AND OBSERVED MR. GOPALAM
SPEAKING WITH THE CITY CLERK AND THEN WITH CAPT. BRENN. MR.GOPALAM WAS
INFORMED BY CAPT. BRENN TO CONTACT HIS LAWYER SINCE THIS WAS A CIVIL.
MATTER AND NOT A CRIMINAL ONE. MR. GOPALAM STATED THAT THIS ANSWER WAS
NOT TO HIS LIKING SO MR.GOPALAM LEFT THE STATION.

OFC D BREAUX

Gonzales_0004

Case 3:12-cv-00542-JJB-SCR   Document 38-3   09/16/13   Page 32 of 63

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

GOPINATH GOPALAM

C.A. NO. 12-542-JJB-SCR

VERSUS

JUDGE: BRADY

CITY OF GONZALES, THROUGH MAYOR
BARNEY ARCENEAUX, ET AL

MAGISTRATE: RIEDLINGER

### DECLARATION OF SHERMAN JACKSON

1. My name is **SHERMAN JACKSON**.

2. I have worked for the City of Gonzales Police Department since 1994.

3. I was Chief of Police for the City of Gonzales Police Department on September 1, 2011.

4. On September 1, 2011, David Breaux provided security to St. James Behavioral Hospital, Inc. while Gopinath Gopalam was terminated from his job.

5. On September 2, 2011, I participated in a meeting with Gopinath Gopalam, Lieutenant Martin and Detective Cannon to determine if criminal activity took place on September 1, 2011.

6. During that meeting Gopinath Gopalam complained that David Breaux did not allow him back into his office.

7. I followed up on Gopalam's complaint and spoke to David Breaux and reviewed the incident report for incident number 2011-00008429 and the related investigation file.

8. On July 3, 2012, Gopalam Gopinath filed a formal complaint against David Breaux. The complaint is attached hereto as Exhibit D-1.

9. Upon receipt of the complaint, I conducted an investigation.

10. I had met with Gopinath Gopalam and David Breaux after the September 1, 2011 incident and therefore was personally familiar of the detail work that David Breaux performed on September 1, 2011 at St. James Behavioral Health Hospital, Inc. as well as Gopinath Gopalam's complaints regarding the same.

**EXHIBIT**

**D**

ALLSTATE LEGAL®

11. I also reviewed the incident report for incident number 2011-00008429 and the related investigation file.

12. Based upon my investigation, I found there was no validity to the complaint because David Breaux was acting in good faith.

13. I documented my findings and placed the same in David Breaux's personnel file. That document is attached hereto as Exhibit D-2.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

Executed on this ___13th___ day of September, 2013.

SHERMAN JACKSON

Case 3:12-cv-00542-JJB-SCR   Document 38-3   09/16/13   Page 34 of 63

# GONZALES POLICE DEPARTMENT

## STATEMENT FORM FOR INCIDENT – CASE # _____

WITNESS_____ or VICTIM_____    DATE 7-3-12 TIME 2:20 PM

FIRST NAME Gopinath MIDDLE_____ LAST Gopalam SUFFIX____
ADDRESS 18123 Manohac Pl. Dr. CITY Prairieville
STATE LA ZIP-CODE 70769 HOME PHONE # 744-3699
CELL PHONE # 931-2218 WORK PHONE#_____
SEX M RACE____ DATE OF BIRTH 04 24 69 D.L.# 008726221
SOCIAL SECURITY #_____ HEIGHT 5'11" WEIGHT 179 lbs

On Sept 2, 2011 Officer David Breaux
was hired by Mr. Wendell Smith 4 Earl Koch
and others as extra duty police officers to escort
me off the premisis.

Complaint 1:

1. Officer took the side of Earl Koch and
acted without any authority restricting
me to enter into my own office at Apollo Management
Consultants inspite of me telling the officers that
I lease this building and the lease is in my
office and if he allows me in, I will show him the
lease. This is a violation of my civil rights

2. Officer gave protection to intruders, Wendell
Smith, Carl Koch and others in GPD Uniform

SIGNATURE                USE BACK SIDE OF FORM IF NEEDED

EXHIBIT
D-1

ALL-STATE LEGAL®

Page 1    Gonzales_0093

inspiteof me pleading to officer that those people have no business and authority to enter my office and stabion by breaking locks and changing locks on all doors, and stealing computers, documents, proprietary business info and personal information.

(3) Officer threatned to arrest me and put me in Jail if I do not leave the premises immediately.

(4) Officer Canceled the 911 dispatch, when me and my staff called 911 for help saying Wendell Smith and all breaking into my office. So the officer told dispatch that there is no breakin, while in reality there is happening one and the officer is giving protection to him.

(5) Officer met with the intruders at Cabellas parking lot as Part of Criminal Conspiracy to execute a plan that was laid out the Night before.

I do believe that officer acted impropaly here and was in fact one of the Conspirachrs who protected the others in Violating my Civil Rights in Conspiring to breaking into my office

USE BACK SIDE OF FORM IF NEEDED
SIGNATURE

Gonzales_0094

# GONZALES POLICE DEPARTMENT

STATEMENT FORM FOR INCIDENT – CASE # _____

WITNESS_____ or VICTIM____          DATE 1-3-17 TIME 2:12 PM

FIRST NAME Gosworth MIDDLE_____ LAST Gopolom SUFFIX____

ADDRESS 18723 Monchac Place DR CITY Prairieville)LA

STATE LA ZIP-CODE 7_7_9 HOME PHONE # 7418 3295

CELL PHONE # 935-2228 WORK PHONE#_____

SEX____ RACE:____ DATE OF BIRTH_____ D.L. #_____

SOCIAL SECURITY #_____ HEIGHT_____ WEIGHT_____

Stealing my proprietary information which
has caused me great damage and continue to do so.

Please allow this a formal complaint against
officer, David breause for his actions and as a
request that this matter be fully investigated.

I have documentation and sworn statements establishing
my claims and am available and eager to
have a meeting and fully brief this issue with
internal affairs within Gonzales Police Dept.

Thanks

SIGNATURE                    USE BACK SIDE OF FORM IF NEEDED

Gonzales_0095

On July 3rd 2012, Gopinath Gopalam appeared at the Gonzales Police Department to file a formal complaint on Officer David Breaux. Gopalam wrote in a statement that Officer Breaux was hired by Wendall Smith and Carl Koch as an extra duty officer to escort him off the property. Gopalam advised that Officer Breaux took sides with Smith and Koch who conspired against him. Gopalam advised that Officer Breaux violated his civil rights and gave protection to intruders. Gopalam advised that Officer Breaux allowed these subjects to enter his business identified as Apollo Management and take several things. On July 5th 2012, I received the written complaint that I was fully aware of because of meeting with Gopalam and Officer Breaux in the past. I have explained to Gopalam that Officer Breaux was hired by the St James Hospital to stand by while he "Gopalam" was fired from the job. Officer Breaux was given information by the business partner of Gopalam and he was acting in good faith under the color of law. I disagree with Gopalam theory of Officer Breaux conspiring with his business partners therefore I find no validity to this complaint.

July 6th, 2012

Chief Sherman Jackson

EXHIBIT

D-2

ALL-STATE LEGAL®

Gonzales_0096

1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF LOUISIANA

3

4    GOPINATH GOPALAM
                              CIVIL ACTION NO.
5                             12-542-JJB-SCR

6    VERSUS                   JUDGE:  BRADY
                              MAGISTRATE:  RIEDLINGER
7    CITY OF GONZALES, THROUGH
     MAJOR BARNET ARCENEAUX,
8    ET AL.

9

10   * * * * * * * * * * * * * * * * * * * * * * * * *

11            TRANSCRIPT OF THE DEPOSITION OF

12                  GOPINATH GOPALAM

13   TAKEN ON BEHALF OF DEFENDANTS, REPORTED IN THE ABOVE

14   ENTITLED AND NUMBERED CAUSE BY DONNA T. CHANDLER,

15   CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

16   * * * * * * * * * * * * * * * * * * * * * * * * *

17            REPORTED AT THE OFFICES OF:

18                KEAN MILLER LLP

19                II CITY PLAZA

20                400 CONVENTION STREET

21                SUITE 700

22                BATON ROUGE, LOUISIANA  70802

23

24       COMMENCING AT 10:00 A.M., ON JUNE 11, 2013

25

EXHIBIT
E
ALL-STATE LEGAL®

1    however trying to get the recordings, they do not
2    have the recording of my office manager calling 911.
3    They have just a report.
4         Q    Okay.  Let's go back in time again.  And
5    you said that the police officer told you that you
6    couldn't go in the building because his understanding
7    was that St. James owned the building?
8         A    Yes.
9         Q    You remember him telling you that?
10        A    Yes.  And I confronted him saying that, I
11   am telling that they don't own the building, so I am
12   part owner of St. James and I'm part owner of real
13   estate company, and I'm hundred percent owner of
14   Apollo Management Consultants which is leasing this
15   space.
16        Q    Then you talked about how the officer told
17   you that you could not go in your building.  How many
18   times were you told by Officer Breaux that you could
19   not go in your building?
20        A    I think Karl Koch told me the first time,
21   and then two times Officer Breaux told me I cannot go
22   in, in spite of me telling all these things,
23   different things.  And the third time I believe he
24   threatened with an arrest in jail, and that's when I
25   took my car and walked off -- drove off the premises.

1    premises.

2         A    So that's what it is, if you do not leave

3    the premises, you will go to jail, and I will arrest

4    you.  I will arrest you; you will go to jail.

5         Q    Okay.  So if Officer Breaux says that he

6    told you that you could be arrested if you did not

7    leave the premises, then you agree that that's what

8    he told you?

9         A    I -- to my knowledge, to my recollection,

10   and he said if I do not leave the premises, he could

11   arrest me and I could go to jail.

12        Q    Okay.  Did Officer Breaux ever place his

13   hands on you?

14        A    No, ma'am.

15        Q    Did Officer Breaux ever tell you that you

16   were under arrest?

17        A    No, ma'am.

18        Q    Did you ever present Officer Breaux with a

19   document supporting your claim that you were allowed

20   access back into the building?

21        A    He didn't allow me to present.

22        Q    But listen to my question.  I appreciate

23   your answer.  But while you were standing out there,

24   did you ever present Officer Breaux with a document

25   supporting your claim that you should be allowed back

1    hold to get in, and I need some help.

2        Q    And remind me when you spoke to the

3    non-emergency person, what was his response?

4        A    I told him the same thing, this is what is

5    happening.  And they said that we have an officer

6    over there; you need to get you attorney.

7        Q    Backing up to whenever you and Officer

8    Breaux were interacting outside of the building, did

9    Officer Breaux ever raise his voice?

10       A    The last time when he threatened me with

11   the arrest in jail, that's when he raised a voice a

12   little bit, but not, not the voice that really shake

13   me up; the body language.  You know, he was just

14   standing straight, but on the other hand, when he was

15   telling that, he just went his hands like this

16   (indicating).  And there is a gun on his -- what do

17   you call -- waist.  So that shook me up, and I just

18   walked out -- walked away.

19       Q    So you are saying when Officer Breaux put

20   his hands on his hip, that shook you up?

21       A    Yes, ma'am.

22       Q    Why?

23       A    Because I was afraid that he's going to do

24   what he said.

25       Q    You were afraid he was going to do what?

```
 1          A    Arrest me.
 2          Q    You mentioned that he had a gun on his hip.
 3     Did he make any motion towards his gun?
 4          A    No, ma'am.
 5          Q    Were you afraid that he was going to
 6     unholster his gun on you?
 7          A    I was afraid he was going to arrest me;
 8     that's what my afraid is.
 9          Q    But he never arrested you, right?
10          A    No, ma'am.
11          Q    Take me from after you're parked, you said
12     at a gas station once you left the premises?
13          A    No.  Across the street.
14          Q    Across the street?
15          A    Uh-huh.
16          Q    Take me from that point.
17          A    Yeah.  I made the call to 911, and then
18     after that, I called the non-emergency line.  After
19     talking to the police officer, I went straight to the
20     Gonzales Police Department office, and said, I need
21     to talk to the police chief, and they said that he's
22     not available, talk to somebody else, and I don't
23     remember who I talked to.  And they asked me to write
24     a report -- and they said they will take the report.
25     Let me put -- they said, okay, tell us the incident
```

```
 1    right to the space or whether they have the right to
 2    the space.
 3        Q    Do you recall what was the sublease that
 4    you gave to the Police Department?
 5        A    I think sublease between St. James
 6    Behavioral Health Hospital and Sevenhills Healthcare.
 7        Q    Mr. Gopalam, I'm handing to you and our
 8    other friends around the table the Sublease Agreement
 9    between St. James Behavioral Health Hospital, Inc.
10    and Sevenhills Healthcare, LLC.  Is that the sublease
11    agreement that you recall --
12        A    Yes, ma'am.
13        Q    -- giving -- I'm sorry.  Let me finish my
14    question.
15             Is this the sublease agreement that you
16    recall giving to the Gonzales Police Department?
17        A    Yes, ma'am.
18        Q    And you said that your recollection is that
19    you gave this sublease to an officer the morning of
20    September 2nd, 2011, right?
21        A    Yes, ma'am.
22        Q    And this is a sublease agreement that was
23    made on September 1st, 2010, between St. James
24    Behavioral Hospital and Sevenhills Healthcare, LLC;
25    correct?
```

1      A    Yes, ma'am.

2      Q    And the space that was leased was what?

3      A    Business office space.

4      Q    Okay.

5      A    Front of the building, front half of the

6 building, which is approximately around 1700 square

7 foot.

8      Q    Okay.  So it looks to me that the original

9 lease was entered into by Aquila Properties, LLC and

10 St. James Behavioral Hospital?

11     A    Yes, ma'am.

12     Q    And then St. James turned around and

13 subleased to Sevenhills Healthcare, LLC?

14     A    Sevenhills, yes, ma'am.

15     Q    And the area that was subleased was the

16 1700 rentable square feet in the building located on

17 3138 South St. Landry Road, Gonzales, Louisiana,

18 70737?

19     A    Yes, ma'am.

20     Q    And if you notice towards the bottom of the

21 document where it has Sublessee, Wendell Smith is

22 signed on behalf of the sublessee, which under this

23 contract was Sevenhills Healthcare, LLC?

24     A    Yes, I see that.

25     Q    And you signed -- is that your signature

1    for the sublessor and for the landlord?

2        A    Yes, ma'am.

3        Q    It's my appreciation that the police

4    department was a little bit confused when you

5    submitted this sublease complaining that Wendell

6    Smith didn't have the right to be inside the building

7    when his signature actually appeared on the sublease.

8    Do you recall that, that confusion by the police

9    department?

10       A    I clarified to them that it was transposed.

11   I signed at the wrong place, and he signed at the

12   wrong place.  But, but the clarity is, Sevenhills --

13   I told them the clarity.  Sevenhills Health Care is

14   hundred percent owned by me, and St. James -- Wendell

15   Smith is CEO for St. James.  And that's in his

16   capacity he signed for St. James, and I signed for

17   Sevenhills Healthcare, and I signed for landlord,

18   which is Aquila Properties.

19       Q    This sublease agreement was never revised

20   so as to put the correct signatures in the correct

21   places if, if what you are claiming is correct?

22       A    We never looked at -- in that detail until

23   this incident happened because we just said the lease

24   is signed, and it is there, because it is all

25   interrelated companies.  So we didn't review it and

1    correct it.  We didn't even look at it, that it was
2    signed wrong, until lawyers looked into it.
3         Q    Mr. Gopalam, can you appreciate the City of
4    Gonzales's hesitation and knowing that they were just
5    dealing with you and with a sublease agreement where
6    it had the name Wendell Smith as the sublessee signed
7    on it?  I mean, do you understand why they hesitated
8    to, to accept what you were saying, that the
9    signatures were transposed?
10        A    No, I don't appreciate.
11                  MS. BELL:  I would like to attach the
12             Sublease Agreement as Gopalam 3.
13                  (Gopalam Exhibit 3 was marked.)
14   BY MS. BELL:
15        Q    Is it this sublease agreement that you
16   claim gave you, Gopinath Gopalam, right to access the
17   building?
18        A    Can you repeat that question, please?
19        Q    Is this sublease, the one between St. James
20   Behavioral Hospital and Sevenhills Healthcare, is
21   this the lease that you claim gives you, Mr. Gopalam,
22   the right to go back inside the building?
23        A    No.  There is another document also, which
24   is the -- because remember I told you in March of
25   2011, Sevenhills Healthcare went dormant, and Apollo

1     Management Consultants came as the new company taking
2     over this operations and management and everything.
3     So at that time, the lease is signed from Sevenhills
4     to Apollo Management Consultants.  Not only that,
5     there is another document, which is a sublease
6     between St. James Behavioral Health Hospital and
7     Apollo Management Consultants that existed, which I
8     was not able to put hands on, and the signed
9     document.
10          Q    So those two other documents, an assignment
11    and an additional lease --
12          A    Yes, ma'am.
13          Q    -- those were the documents that you
14    believe gave you the right to go back inside the
15    building?
16          A    Yeah, all combination of the documents.
17          Q    But those other two documents, the
18    assignment and the additional lease, those were not
19    presented to the Gonzales Police Department?
20          A    On that day, yes, no.  On that day, they
21    were not produced to them.
22          Q    The only documents that were --
23          A    I think I produced the unsigned document.
24    I produced the unsigned document of Apollo Management
25    Consultants lease document.

1  the occupational license documents issued by the City

2  of Gonzales to my recollection.  I don't remember

3  whether I showed them the copies of the checks that

4  the lease amount is paid on that day.  I have no -- I

5  know eventually I showed them everything, because I

6  made several trips to Gonzales City Police office and

7  showed them different, different things at different,

8  different times.  And I put together a whole binder

9  of information to the Gonzales City Police, to the

10 Sheriff's Office and to the DA's Office.  That binder

11 is circulated between all those three, three

12 departments.

13     Q     Okay.  We have talked about the sublease

14 agreement between St. James Behavioral Hospital and

15 Sevenhills Healthcare that's signed by Wendell Smith.

16 The other document that you claim that you gave to

17 the city was the unsigned sublease agreement between

18 St. James Behavioral Hospital and Apollo Management

19 Consultants?

20     A     Yes, ma'am.

21     Q     I'm handing over to you a copy of the

22 sublease agreement between St. James Behavioral

23 Hospital and Apollo.  Is that the sublease agreement

24 that you are talking about, the unsigned one?

25     A     It is not -- I just had a copy from my

1    computer that I printed this one.  But actual signed
2    document was in my office that was lifted by these
3    intruders.
4         Q    So your reason for why it's not signed is
5    because this document was stolen?
6         A    Yes, ma'am.
7         Q    Who was it stolen by?
8         A    I do not have the copy of the signed
9    document because it is there in my office, and by the
10   time I went back into my office, that document is not
11   there.  This is just a printed off from the computer.
12        Q    And assuming that this sublease agreement
13   was signed and executed, this was for the same 1700
14   rentable square feet located at 3138 South St. Landry
15   Road, Gonzales, Louisiana, 70737; correct?
16        A    Uh-huh.  Yes, ma'am.
17        Q    And you said what predated this sublease
18   agreement was an assignment?
19        A    Yes.
20             MS. BELL:  I would like to mark this
21        Sublease Agreement between St. James Behavioral
22        Health Hospital and Apollo as Gopalam 4.
23             (Gopalam Exhibit 4 was marked.)
24   BY MS. BELL:
25        Q    Mr. Gopalam, I'm handing to you, even

```
 1                    MR. ALEXANDER:  Oh, sure.
 2      BY MS. BELL:
 3           Q    Let's look at Count II.  Is your copy
 4      highlighted?
 5           A    Yeah.
 6           Q    Would you mind switching with me?
 7                Paragraph 72 --
 8           A    Uh-huh.
 9           Q    -- provides that, "Prior to September 1,
10      2011, the City of Gonzales and/or Gonzales City
11      Police Department developed and maintained policies
12      or customs exhibiting deliberate indifference to the
13      constitutional rights of persons in the City of
14      Gonzales, which policies or customs caused violation
15      of plaintiff's rights."  Did I read that correctly?
16           A    I'm reading it.
17           Q    Okay.
18           A    Yes, ma'am.
19           Q    What evidence do you have that the City of
20      Gonzales or the police department developed or
21      maintained these customs or policies about deliberate
22      indifference to constitutional rights?
23                    MR. ALEXANDER:  Subject to the fact
24           that this -- that none of the defendants have
25           yet been deposed in this case, out of an
```

1      abundance of caution, we make these allegations.
2      Answer the best you can.  And with the provision
3      that you're not a lawyer.

4      A      Okay.  The question that we have here is,
5  according to the paragraph 72, "Prior to September 1,
6  2011, City of Gonzales and/or the Gonzales City
7  Police Department developed and maintained policies
8  or customs exhibiting deliberate indifference to the
9  constitutional rights of persons in the City of
10 Gonzales which policies or customs caused the
11 violation of plaintiff's rights."

12     Okay.  I did not see or look at any
13 policies or anything that they have per se, but from
14 what happened on that day, and what the Police
15 Department is justifying what they did is right, and
16 that makes me believe that they have policies and
17 procedures that violates the constitutional rights of
18 the persons.

19 BY MS. BELL:

20     Q      Do you have any evidence or knowledge of
21 any prior acts by the City of Gonzales or its police
22 officers similar to what you claim happened here?

23     A      There are a couple of incidents that came
24 in the newspapers that City of Gonzales police
25 violated the rules.  They would speed on the roads,

1   and some police officer tried to stop them and they
2   think no, we are just doing it.  So nothing happens
3   to them.
4       Q    So tell me examples specifically of what
5   you have of prior incidents where the City of
6   Gonzales or its police officers were violating
7   constitutional rights similar to what you allege
8   happened in your situation.  Do you have specific
9   examples?
10      A    I just gave you the example.  The specific
11  example is speeding on the road which another police
12  officer, same Gonzales police officer, tried to stop
13  them and they wouldn't stop.  And it is Chief
14  Sherman's -- what you call -- vehicle that is
15  speeding on the road?
16      Q    So who's speeding?
17      A    Chief Sherman Jackson's car.  I don't know
18  what you call it, car, vehicle, van, or whatever it
19  is.
20      Q    Okay.
21      A    And he is speeding, and another Gonzales
22  police officer is trying to stop him, and they didn't
23  stop.
24      Q    Okay.  So that's your evidence of other
25  incidents?

1          A     He did not specifically use those words, it

2     is not uncommon to threaten people and arrest people.

3     He used the words, "It is not uncommon to what

4     happened in your incident.  It is how we do things."

5     And there is nothing wrong that Officer Breaux did,

6     and it is in line with what we have.

7          Q     Paragraph 74, "It was the policy or custom

8     of the City of Gonzales and/or the Gonzales City

9     Police Department to tolerate known misconduct by

10    defendant officers."

11         A     As evidenced by what I said just now.

12         Q     So the same thing you talked about earlier

13    is what would be your evidence to support that?

14         A     Yes, ma'am.

15         Q     What about paragraph 76, "It was the policy

16    and/or custom of the City of Gonzales and/or the

17    Gonzales City Police Department to inadequately

18    supervise and train its police officers, including

19    Officer David Breaux and certain other unknown

20    officers of the Gonzales Police Department, thereby

21    failing to adequately discourage further

22    constitutional violations on part of its officers --

23    of its police officers."

24              What evidence do you have that the city

25    and/or the Police Department inadequately supervised

1    or trained its police officers?

2        A    Just by evidence of what the police officer

3    did and why he was not trained to know what to do and

4    what not to do.  That's -- by the events of what

5    happened on the incident.

6        Q    Do you have knowledge of any prior actions

7    that predate the September 1, 2011, incident where

8    the City of Gonzales inadequately supervised or

9    trained its police officers?

10       A    Not any particular incident.  I'll put

11   close thing.

12       Q    Count III on page 16, paragraph 84, why

13   don't you take a look at that.  And after you finish

14   reading it, let me know.

15       A    Yes, ma'am.

16       Q    First of all, do you know what certain

17   other unknown officers of the City of Gonzales Police

18   Department, do you know who that refers to?

19       A    That refers to all the people who I talked

20   to, who I called on 911, who are stationed on

21   September 2nd.

22       Q    As to Officer Breaux, what is the -- why do

23   you claim that he failed to exercise due care?

24       A    Because he just blindly believed what

25   Dr. -- what Mr. Karl Koch told him and didn't pay any

1                    REPORTER'S CERTIFICATE

2          I, DONNA T. CHANDLER, Certified Court Reporter

3     in and for the State of Louisiana, and Registered

4     Merit Reporter, and as the officer before whom this

5     testimony was taken, do hereby certify that GOPINATH

6     GOPALAM, after having been duly sworn by me upon

7     authority of R.S. 37:2554, did testify as set forth

8     in the foregoing 316 pages.

9          I further certify that said testimony was

10    reported by me in the Stenotype reporting method,

11    complemented with digital recording, was prepared and

12    transcribed by me or under my direction and

13    supervision, and is a true and correct transcript to

14    the best of my ability and understanding.

15         I further certify that the transcript has been

16    prepared in compliance with transcript format

17    guidelines required by statute or by rules of the CSR

18    Board, that I have acted in compliance with the

19    prohibition on contractual relationships, as defined

20    by Louisiana Code of Civil Procedure Article 1434,

21    and in rules and advisory opinions of the CSR Board.

22         I further certify that I am not an attorney or

23    counsel for any of the parties, that I am neither

24    related to nor employed by any attorney or counsel

25    connected with this action, and that I have no

1    financial interest in the outcome of this matter.

2         This certificate is valid only for this

3    transcript accompanied by my original signature and

4    original required seal on this page.

5         Baton Rouge, Louisiana, this 17th day of June,

6    2013.

7

8

9            DONNA T. CHANDLER, CCR, RMR
            CCR NO. 29002, NCRA NO. 009411

10

11

12                 OFFICIAL SEAL
               DONNA T. CHANDLER
13           Certified Court Reporter
        in and for the State of Louisiana
        Certificate Number  29002
14        Certificate expires 12-31-13

15

16

17

18

19

20

21

22

23

24

25

Case 3:12-cv-00542-JJB-SCR   Document 303   09/16/13   Page 57 of 63



SUBLEASE AGREEMENT

BETWEEN

St. James Behavioral Health Hospital, Inc, SUBLESSOR

AND

SEVENHILLS HEALTHCARE, LLC, SUBLESSEE

Building Address:

        3138 S. St Landry Road (Front Side)
        Gonzales, LA 70737



PLAINTIFF_000048

**SUBLEASE AGREEMENT**

SUBLEASE AGREEMENT ("Sublease") made as of this 1st day of Sept, 2010, by and between St. James Behavioral Health Hospital, Inc ("Sublessor") and Sevenhills Healthcare, LLC ("Sublessee").

### WITNESSETH:

WHEREAS, pursuant to a lease dated 1st day of Jan 2010, between Aquila Properties, LLC, as Landlord ("Landlord"), and Sublessor, as Tenant ("Prime Lease"), Landlord leased to Sublessor office space, containing approximately 4,170 rentable square feet ("Premises"), in the building located at 3138 S. St Landry Road, Gonzales, LA 70737.

WHEREAS, Sublessor desires to sublease to Sublessee and Sublessee desires to sublease from Sublessor Front part of the building, containing approximately 1700 rentable square feet.

NOW, THEREFORE, Sublessor and Sublessee covenant and agree as follows:

1.      Sublease Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor, the Subleased Premises which the parties acknowledge and agree contain approximately 1700 rentable square feet for all lawful purposes under the Sublease.

2.      Terms and Conditions All terms and conditions that are spelled out in the Prime lease Produced as Exibit "B" (between the landlord and tenant, here referred as sublessor) will guide this sublease except the base term rent and the monthly rent which is spelled out in this agreement.

3.      Base Rent During the entire Term, Sublessee shall pay Sublessor, as rent for the Subleased Premises, the following annual sum ("Base Rent"), in equal monthly installments, in advance on the first day of each month, without setoff or deduction whatsoever:

| Period | Annual Base Rent | Monthly Base Rent | Total Base Term Rent |
|---|---|---|---|
| Sept 1 2010 – Aug 31 2013 | 24000 | 2000 | 72000.00 |

4.      Term The term of the initial lease is 3 years with an option to renew for two thirty-six (36) months.

IN WITNESS WHEREOF, this Sublease has been executed as of the day and year first above written.

WITNESS By: _Shula Blanchard_          SUBLESSOR: _____
                                        Name & Title:

WITNESS By: _Shula Blanchard_          SUBLESSEE: _____
                                        Name & Title:

Aquila Properties, LLC, as Landlord ("Landlord"), consents and agrees St. James Behavioral Health Hospital, Inc to sublease the office space to Sevenhills Healthcare, LLC as stated above.

WITNESS By: _Shula Blanchard_          LANDLORD: _____
                                        Name & Title:

PLAINTIFF_000049

## EXHIBIT A

**Floor Plan of Subleased Premises**

## EXHIBIT B

**Prime Lease**

PLAINTIFF_000050



SUBLEASE AGREEMENT

BETWEEN

St. James Behavioral Health Hospital, Inc, SUBLESSOR

AND

APOLLO Management Consultants, LLC, SUBLESSEE

Building Address:

      3138 S. St Landry Road (Front Side)
      Gonzales, LA 70737





G - 1 ⱱ

## SUBLEASE AGREEMENT

SUBLEASE AGREEMENT ("Sublease") made as of this 1st day of April, 2011, by and between **St. James Behavioral Health Hospital, Inc** ("Sublessor") and **APOLLO Management Consultants, LLC** ("Sublessee").

### WITNESSETH:

WHEREAS, pursuant to a lease dated 1st day of Jan 2010, between Aquila Properties, LLC, as Landlord ("Landlord"), and Sublessor, as Tenant ("Prime Lease"), Landlord leased to Sublessor office space, containing approximately 4,170 rentable square feet ("Premises"), in the building located at 3138 S. St Landry Road, Gonzales, LA 70737.

WHEREAS, Sublessor desires to sublease to Sublessee and Sublessee desires to sublease from Sublessor Front part of the building, containing approximately 1700 rentable square feet.

NOW, THEREFORE, Sublessor and Sublessee covenant and agree as follows:

1.  Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor, the Subleased Premises which the parties acknowledge and agree contain approximately 1700 rentable square feet for all lawful purposes under the Sublease.

2.  Terms and Conditions All terms and conditions that are spelled out in the Prime lease Produced as Exibit "B" (between the landlord and tenant, here referred as sublessor) will guide this sublease except the base term rent and the monthly rent which is spelled out in this agreement.

3.  Base Rent During the entire Term, Sublessee shall pay Sublessor, as rent for the Subleased Premises, the following annual sum ("Base Rent"), in equal monthly installments, in advance on the first day of each month, without setoff or deduction whatsoever:

|  | Annual | Monthly | Total Base |
|---|---|---|---|
| Period | Base Rent | Base Rent | Term Rent |
| April 1 2011 – Mar 31, 2014 | 24000 | 2000 | 72000.00 |

4.  Term The term of the initial lease is 3 years with an option to renew for two thirty-six (36) months.

IN WITNESS WHEREOF, this Sublease has been executed as of the day and year first above written.

WITNESS By:_____     SUBLESSOR:_____
                                         Name & Title:

WITNESS By:_____     SUBLESSEE:_____
                                         Name & Title:

Aquila Properties, LLC, as Landlord ("Landlord"), consents and agrees St. James Behavioral Health Hospital, Inc to sublease the office space to APOLLO Management Consultants, LLC as stated above.

WITNESS By:_____     LANDLORD:_____
                                         Name & Title:

Case 3:12-cv-00542-JJB-SCR   Document 38-3   09/16/13   Page 62 of 63

## EXHIBIT A

Floor Plan of Subleased Premises

## EXHIBIT B .

Prime Lease